Spear, C. J.
The action in the circuit court was brought under favor of the act of April 8, 1896, entitled “An act to prevent corrupt practices at elections,” 92 Ohio Laws, 123. Section 7 of that act gives the right to any elector entitled to vote at any election (save for members of congress or the general assembly), to present in writing to the attorney-general an application setting forth, among other charges, the doing by a person elected to office at such election, of any act or acts declared unlawful by any law of this state, for the purpose of promoting his election, and thereupon it *46 becomes the duty of the attorney-general to direct the prosecuting attorney of the proper county to bring an action to have the office declared vacant, such action to “be deemed to be and conducted according to the rules prescribed by law for an action against the usurper of an office.” And if any of the charges are sustained, judgment shall be rendered declaring void the election, declaring such office vacant, and ousting the defendant.
The petition charged, among other things, a violation by the defendant of that part of section 32 of the election law of April 18, 1892 ( 89 O. L., 451), which provides that:
“Whoever, directly or indirectly, by himself or through any other person, either gives, offers or procures or promises to procure, or endeavors to procure, any office, place or employment, to, or for any elector, or to or for any other person, in order to induce any elector to register or refrain from registering, for any election, or to vote or refrain from voting at any election, or to vote or refrain from voting at such election for any particular person or persons, or question or proposition, ” shall be punished by fine, or imprisonment in the penitentiary, or both.
The demurrer to the petition raises the question of the constitutionality of that part of section seven of the act of April 8, 1896, heretofore recited, and the refusal of a jury by the trial court raises the question whether or not, in such an action, the defendant is entitled to trial by jury. Other provisions of the statute are attacked as unconstitutional. But those questions are not raised by this record, and it is not necessary for us to inquire beyond the questions actually involved.
*47 1. The constitutionality of the act. It is assailed as repugnant to the constitution in that it undertakes to declare a citizen ineligible to office for criminal acts of his without a conviction of such crime. Section 4 of article 5, is cited. That section provides that: “The general assembly shall have power to exclude from the privilege of voting, or being eligible to office, any person convicted of bribery, perjury, or other infamous crime.” The contention is that this section is a grant of power to the general assembly; that a grant of power to deprive a citizen of part of his political rights, on conviction of certain crimes, necessarily denies the power to do so without conviction, or for different crimes; and that the case comes within the rule, as given in Cooley’s Con. Lim., page 78, “that when the constitution defines the circumstances under which a right may be exercised, or a penalty imposed, the specification is an implied prohibition against legislative interference to add to the condition, or to extend the penalty to other eases. ” The rule seems to have met with general acceptance.
Its application in the present case would appear to depend upon whether the section quoted is a grant of power, or a limitation upon power otherwise granted. To determine this we should look at other provisions of the constitution to ascertain where, by its terms, power to punish crimes, to direct the conduct of elections, to prescribe qualifications for voting and for taking office, is lodged. Clearly, in the nature of things, such power cannot belong either to the executive or judicial departments. It belongs naturally to the legislative. It is a part of the legislative power, and we find that, by section 5 of article 2, this *48 power is vested in the general assembly in as ample terms as could be chosen to express it. “In creating a legislative department, and conferring upon it the legislative power, the people must be understood to have conferred the full and complete power as it rests in, and may be exercised by the sovereign power of the country, subject only to such restrictions as they may have seen fit to impose. ” * * * “The legislative department is not made a special agency for the exercise of specifically defined powers, bub is intrusted with the general authority to make laws at discretion.” Cooley, p. 104. And, says Denio, J., in People v. Draper, 15 N. Y., 532: “The people in framing the constitution committed to the legislature the whole law-making power of the state, which they did not expressly withhold. Plenary power in the legislature, for all purposes of civil government, is the rule. A prohibition to exercise a particular power is an exception.” And by Scott, J., in Lehman v. McBride, 15 Ohio St., 591-2: “This grant of power is general in its terms, not special; it embraces all such legislative power as the people of the state could, under the federal constitution, confer — the whole ‘legislative power of the state. ’ The limitations upon the exercise of the power thus broadly conferred, are special, and are to be found in other parts of the same instrument.” * * *' “Therefore, when the power of the general assembly to enact such a law (the soldiers’ voting act) is drawn in question, the proper inquiry is, whether such an exercise of legislative power is clear 1 j prohibited by the constitution. The grant of power being general, the question is as to the existence of a limitation, arising from special prohibition. ’ ’ ‘ ‘Such prohibition must either be found *49 in express terms, or be clearly inferable, by necessary implication, from tbe language of the instrument, when fairly construed according to its manifest spirit and meaning.” Citing Baker v. Cincinnati, 11 Ohio St., 542, where it is said by Gholson, J.: £‘It will be observed that the provision is not, that the legislative power, as conferred in the constitution, shall be vested in the general assembly,but that the legislative powet' of this, state shall be vested. That includes all legislative power which the object and purposes of the state government may. require, and we must look to other provisions of the constitution to see how far, and to what extent, legislative discretion is qualified or restricted.” Citing, also, Evans v. Dudley, 1 Ohio St., 437, and Cass v. Dillon, 2 Ohio St., 607. It follows from this, that, without question, ample power to legislate upon all the subjects hereinbefore enumerated is conferred upon the general assembly.
The right to vote and to hold office is. nob of necessity connected with citizenship. Neither is it a natural right, such as the right to personal security, personal liberty, or the right to acquire and enjoy property. It is within the power of the people to give or refuse, restrict and regulate the franchise. And when conferred it is not a natural right, but may be taken away by the power that gave it. McCrary on Elections, sections 3 and 4. That is, the right depends upon the law of the land And, except where restrained by the constitution, the power of the general assembly over it is unlimited.
And, belonging to this general subject, is the subject of elections. No subject comes more eer *50 tainly within legislative power than does this. In the very nature of things it must be so. But the general duty is especially devolved on the general assembly by the constitution. The time for the election of legislative, executive, and judicial officers having been designated, and provision having been made that all elections shall be by ballot, by section 1 of article 10, the duty is enjoined upon that body to provide by law for the election of county and township officers, and, by section 27 of article 2, it is provided that: “The election * * * of all officers not otherwise provided for by the constitution * * * shall be made in such manner as may be directed by law.” It thus appears that the whole subject of elections, save so far as it is, in distinct terms, or by clear implication, controlled by the constitution, is devolved upon the general assembly, and that the power of that body over it is untrammeled, and that the details, as they relate to the manner or mode of holding elections are expressly referred to legislative discretion.
From a consideration of all the provisions of the constitution referred to, we are led to the conclusion that, while the question may not be free from doubt, the better view is tha' section 4 of article 5, is not in itself a grant of power, but a limitation upon power otherwise generally granted, and that this conclusion is in no way affected by section 5 of article 2. That is, had these sections not been adopted, the general assembly, by force of the general grant of legislative power, could have provided a permanent disqualification from voting, and from holding office, for causes or offenses other than those enumerated in the.sections above cited.
*51 This conclusion leads to the further conclusion that the rule given by Cooley, cited by counsel, and hereinbefore quoted, does not control the case, but that other rules of construction equally reasonable aijd equally well recognized, which are given by the same author, are more in point. One is that “when a constitution gives a general power, or enjoins a duty, it also gives by implication, every particular power necessary for the exercise of the one or the performance of the other.” And, chin to this, “where power is granted in general terms, the power is to be construed as coextensive with the terms, unless some clear restriction upon it is dedueible (expressly or by implication) from the context.” It would obviously follow that where, by one section, a general, unlimited power is given, and that is abridged by another section of the same instrument, the limitation is not to be held more comprehensive than its terms clearly import. And, to justify the claim that the limitation of the constitution inhibits the attempted exercise of the power in the particular case by the general assembly, it should be shown that the objects contemplated by the constitutional provision and the statutes are substantially identical. Such, we think, is not the case here. The object of section 4 is to authorize the general assembly to award a punishment upon conviction of infamous crime, which will permanently exclude the criminal from voting and from holding office, and the effect of the statute enacted by virtue of that section, is to accomplish that object. The corrupt practices act does not undertake to authorize this. It does not provide any disability as to voting, nor does it render the person offending permanently ineligible to office. Comparing the two provisions by their operation *52 and effect, the operation and effect of the constitutional provision, carried into legislation, are to punish for infamous crime, committed anywhere, at any time, with reference to any subject-matter, and to permanently disqualify from voting at any election and from holding any office, while the operation and effect of the provision of the statute are simply and only to disqualify from a particular office in the interest of pure elections, where the person claiming the office has violated the terms of the statute under which, and by virtue of which, he claims to have been elected. The statute operates upon the election and upon the office; it holds the one void and the other vacant; as a result it excludes the person from any benefit under the election which his unlawful acts have rendered of no effect, but it does not award punishment. The vice which enters into the election and renders it void, is the misconduct in reference to that particular election of the person who claims a benefit under it. He has violated the implied interdict of the statute by attempting to promote his election by impure and immoral acts, having a tendency to corrupt the voters and prevent a fair and legal election. Upon every principle of justice and fairness he should be prevented from reaping an advantage from his own wrong.
A question much discussed is as to whether the statute should be treated as imposing a test of ineligibility, or as providing a method of removal. The matter may be not free from doubt. Possibly the provision involves both characteristics. But the better conclusion, we think, is that the intent of the legislature was, not to provide a method by which a person lawfully elected to an office may be removed therefrom, but rather a method by which *53 the title of one to an office which he has obtained possession of in violation of the terms of the statute upon which his claimed right vests, may be inquired into. It is, therefore, a challenge of the title to the' office, resting upon charges of misconduct in procuring it, rather than a process to remove, resting upon charges of misconduct in office.
Our conclusion with respect to the effect of section 4 of article 5, is, that if the framers of the constitution had intended to deny to the general assembly the power to render void an election because of illegal acts by the successful candidate, done for the purpose of promoting his election, they would have declared that purpose in unequivocal terms, and would not have left such result to depend upon doubtful implication. We have already found that there is no clear expression of such an intent. It follows that the provisions of the corrupt practices act involved in the case before us do not contravene section 4 of article 5, of the constitution.
Nor are the provisions of the statute in conflict with either article 5, or with section 4 of article 15, of the constitution. The former article provides who may be electors, and that electors shall be entitled to vote at all elections. Section 4 of article 15 is: “No person shall be elected or appointed to any office in this state unless he possesses the qualifications of an elector.” But it does not follow from this that every person who has the qualifications of an elector shall be eligible to any office in the state. The well-settled rule is that, while the legislature is without power to deny or abridge a constitutional right of a citizen to vote, or to hold office, nevertheless laws to regulate the exercise of the elective franchise, if reasonable, *54 uniform and impartial, and calculated to facilitate the exercise of the right, are clearly within the legislative competency, and decisions to the effect 'that qualifications upon the right to take office other than the one imposed by the section quoted, are numerous. State v. Crooks, 7 Ohio Rep., 579; The State v. Covington, 29 Ohio St., 102. At page 118, it is remarked by Mcllvaine, J.: “If the framers of the constitution had intended to take away from the legislature the power to name disqualifications for office other than the one named in the constitution, it would not have been left to the very doubtful implication which is claimed from the provision under consideration. The power under the general grant being ample and certain, a statute should not be declared void because in conflict with an alleged implication unless such implication be clear and indubitable. ” It may be added that there are implied disqualifications. A person may not hold incompatible offices, as an officer who presents his personal account for audit and officer who passes upon it, or sheriff and justice of the peace, or governor and member of the general assembly, or, as held in The State v. Taylor, 12 Ohio St., 130, the office of director of county infirmary and superintendent of the infirmary. The list might be indefinitely extended.
No duty enjoined upon the general assembly is higher, or of greater general interest to the commonwealth and the individual citizen, than that of securing, within constitutional limits, the full, untrammeled right of the elector to vote, to have that vote counted and not neutralized by an illegal vote, and securing, in addition, a fair expression at the ballot box of the public voice, freed from corrupting influences. And where this duty has been *55 attempted by legislation calculated to secure these rational and desirable ends, courts will interfere with its operation only upon the clearest and most unquestioned conviction of its invalidity. A mere doubt is not sufficient. We are of opinion that the provisions of the act involved in this case are not in contravention of any section of the constitution, at least not clearly so, and are valid.
2. The right to a jury. Our constitution declares that the right of trial by jury shall be inviolate. This means the right as it existed in this state at the adoption of the constitution of 1802. Not that every question of fact was to be tried by a jury; only questions of fact in certain classes of cases. The distinctions indicated by our statutes, and by practice from the organization of the state, show this. Code, sections 263, 264; 51 O. L., 100; sections 5130 and 5131, Revised Statutes. The right applied only to common law courts, and in actions involving life, liberty, or the right to private property. Willard v. Hamilton, 7 Ohio Rep., 449. And we regard it as safe to say that there never has been a statute in Ohio authorizing a jury, nor will there be found a reported case in this state where a jury was called, or held to be proper, in a suit to determine title to an office; certainly none has been cited. We suppose the reason to be plain. A public office is a trust held for the benefit of the public. The incumbent, if he performs the duties, may be entitled to the emoluments, but he cannot have, under our governmental system, any prop^ erty in the office itself. The State v. Hawkins, 44 Ohio St., 98, and see especially remarks of Minshall, J., on pages 110 and 113, and the cases there cited. There being no property right involved in the inquiry, a jury cannot be had in an action to try *56 title to an office. Contrary holdings have been made in other states by courts of high repute. But we think the law of Ohio is clearly as held by the circuit court. The question is not a new one in this court. In The State ex rel. Attorney-General v. Blood, (quo warranto) a demand for a jury was made, March 25, 1887, and argued by eminent counsel. The demand was refused. 17 W. L. B., 290. The case was then referred to a master to take testimony, but was finally dismissed by relator, and, for that reason, was not reported.
Other questions of procedure are argued, but we do not regard them of sufficient importance to warrant comment except to say that we find no error.

Judgment affi/i'med.